**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
Keren E. Gesund (SBN 253242)
Robert V. Cornish, Jr. (*pro hac vice* to be filed)
680 South Cache Street, Suite 100, PO Box 12200
Jackson, WY 83001
Tel: (307) 264-0385
Email: keren@rcornishlaw.com

*Attorneys for Plaintiff Ken Liem*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEN LIEM, <br><br> Plaintiff, <br><br> v. <br><br> CHONG HING BANK LIMITED; DBS BANK (HONG KONG) LIMITED; FUBON BANK LIMITED; RICHOU TRADE LIMITED; FFQI TRADE LIMITED; XIBING LIMITED; and WEIDEL LIMITED, <br><br> Defendants. | Case No. 8:24-cv-2819 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Ken Liem ("Plaintiff"), by and through his counsel of record, as and for his complaint against Chong Hing Bank Limited ("Chong Hing"); DBS Bank (Hong Kong) Limited ("DBS"); Fubon Bank Limited ("Fubon"); Richou Trade Limited ("Richou"); FFQI Trade Limited ("FFQI"); Xibing Limited ("Xibing"); and Weidel Limited ("Weidel") allege as follows:

# INTRODUCTION

1. Crypto-fraud scams such as pig-butchering have emerged as a multibillion-dollar criminal specialty that has entrapped victims around the world.[1] Plaintiff is one of those victims.

2. A fraudster contacted Plaintiff and presented a purported cryptocurrency investment to him. The fraudster persuaded Plaintiff to wire funds from his account with Wells Fargo to accounts maintained at DBS, Fubon, and Chong Hing banks ("Banking Defendants") under the guise of investing in cryptocurrency. Richou, FFQI, Xibing, and Weidel ("Recipient Defendants") were holders of those accounts opened at Banking Defendants and to which Plaintiff was instructed to send money.

3. Unbeknownst to Plaintiff, the Recipient Defendants never invested his money in cryptocurrency. They were frauds from the start. On information and belief, the sums were unlawfully diverted to other third-party accounts for unauthorized use.

4. Recipient Defendants extracted hundreds of thousands of dollars from Plaintiff and together perpetrated a fraud against him.

5. Banking Defendants' complete failure to comply with relevant know-your-customer and anti-money laundering ("KYC/AML")[2] laws when opening accounts for Recipient Defendants amounted to (a) substantial assistance to

---

[1] *See* Tom Wilson, *How "pig butchering" scams have emerged as a billion-dollar crypto industry*, REUTERS (Dec. 8, 2023), https://www.thomsonreuters.com/en-us/posts/investigation-fraud-and-risk/pig-butchering-scams/. "Such pig-butchering scams — so called because the unsuspecting victim of the scam (the pig) is tricked by scammers into forking over money for a promised big return — have drawn intensifying scrutiny from global law enforcement over the past year, but little is publicly known about the people behind them." *Id.*

[2] The Financial Crimes Enforcement Network recently assessed a record $1.3 billion penalty against TD Bank, N.A. and TD Bank USA, N.A. for violations of the Bank Secrecy Act because the entities allowed their AML programs to languish, making TD Bank a target for illicit actors. *See FinCEN Assesses Record $1.3 Billion Penalty against TD Bank*, Financial Crimes Enforcement Network (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank.

Recipient Defendants' frauds and (b) willful blindness to business activities that bore "red flags" that any reasonable financial institution would view as criminal and fraudulent. Any simple review of Recipient Defendants would have revealed a *complete lack* of credible evidence that their business activities were lawful or legitimate. Their decision to bury their heads in the sand and refuse to conduct any due diligence to verify the identity of their potential new customers aided and abetted frauds for which this Court must hold them liable.

## THE PARTIES

6. Plaintiff is an individual who resides in Orange County, California.

7. Defendant Chong Hing Bank Limited is a Hong Kong SAR People's Republic of China entity with a principal place of business at Chong Hing Bank Centre, 24 Des Voeux Rd. Central, Hong Kong SAR People's Republic of China.

8. Defendant DBS Bank Limited is a Singaporean multinational banking and financial services corporation with its headquarters at Marina Bay Financial Centre, 10 Marina Boulevard, Singapore 018983. On August 3, 1982, DBS registered with the California Secretary of State to transact business within California. DBS's sole place of business within the U.S. is located at 300 South Grand Avenue, Suite 3075, Los Angeles, California 90071.

9. Defendant Fubon Bank Limited is a Hong Kong SAR People's Republic of China entity with a principal place of business at Fubon Bank Building, 38 Des Voeux Road, Central, Hong Kong SAR People's Republic of China.

10. Defendant Richou Trade Limited is a Hong Kong SAR People's Republic of China entity with a last known address of Unit 2223 22 F Yans Tower, 35-27 Wong Chul Hang Road, Aberdeen, Hong Kong SAR People's Republic of China.

11. Defendant FFQI Trade Limited is a Hong Kong SAR People's Republic of China entity with a last known address of RM 27 2F Block A, Ph 136, 40 Tai Lin Paid Road, Kwai C, Hong Kong SAR People's Republic of China.

12. Defendant Xibing Limited is a Hong Kong SAR People's Republic of China entity with a last known address of Room 22, A Block 10 F Manning Ind. Building, 116 118 How Ming Street, Kwun Tong Kowloon, Hong Kong SAR People's Republic of China.

13. Defendant Weidel Limited is a Hong Kong SAR People's Republic of China entity with a last known address of Room 5003, Floor 5, Yau Lee Centre, 45 Hoi Yuen Road, Kwun Tong, Hong Kong SAR People's Republic of China. Weidel shares the same address as Wedge Limited and Tianzhu Special Steel Company.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of the State of California. All defendants are non-citizens of the United States.

15. This court may exercise specific jurisdiction over Defendants because their role in perpetuating and/or assisting the fraud against Plaintiff constituted an injury to Plaintiff in this jurisdiction, thus rendering the exercise of jurisdiction by this Court proper and necessary.

16. Venue is proper in the Central District of California because a substantial part of the acts or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

17. Banking Defendants are financial institutions subject to KYC/AML regulations that require establishing proof of an account holder's legal identity to identify suspicious transactions and prevent fraud. This is especially so when banking customers such as the Banking Defendants accept funds sourced from the United States of America.

18. KYC regulations are part of the federal Anti-Money Laundering ("AML") laws. The Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq,* applies to (i) U.S. branches of foreign financial institutions operating within the U.S.; (ii)

non-U.S. operations of foreign financial institutions due to their relationships with their U.S.-based operations, particularly through correspondent banking relationships; and (iii) financial institutions operating exclusively outside the U.S. if it is the recipient of transactions processed through a U.S. financial institution, or if U.S. sanctions affect the financial institutions or the countries in which they operate.[3]

19.  Thus, the BSA applies to DBS because it maintains a branch in Los Angeles, as well as Fubon and Chong Hing because their transactions were processed through a U.S. institution, in this case Wells Fargo, where Plaintiff maintained the accounts from which he issued wire transfers. *See* 31 U.S.C. § 5312.

20.  All financial institutions subject to FinCEN regulations are required to maintain risk-based AML programs. *See* 31 C.F.R. §§ 1010-1020. A February 2012 report by the Financial Action Task Force (FATF), an intergovernmental organization created by the G7 to develop AML policies, discusses how banking institutions in other countries should identify, assess, and understand money laundering and terrorist financing risks, and then take action to apply resources to effectively mitigate those risks in ways commensurate with the risks identified. A copy of FATF is attached as **Exhibit "1".**

21.  With respect to customer due diligence, FATF advises financial institutions should be required to undertake due diligence when (i) establishing business relations; (ii) carrying out occasional transactions above the designated threshold of USD/EUR 15,000 or certain wire transfers; (iii) there is a suspicion of money laundering or terrorist financing; or (iv) the financial institution has doubts about the veracity or adequacy of previously obtained customer identification data.

22.  Under the FATF, customer due diligence measures to be taken are,

---

[3] "As FinCEN has shown on previous occasions, foreign operating financial institutions are well within its authority as promulgated under the BSA and the USA PATRIOT Act." Stan Sater, *Do We Need KYC/AML: The Bank Secrecy Act and Virtual Currency Exchanges*, 73 Ark. L. Rev. 937 (2020) (citing *United States v. Budovsky*, No. 13cr368 (DLC), 2015 U.S. Dist. LEXIS 127717, at *24 & n.5 (S.D.N.Y. Sept. 23, 2015)).

among others, (a) identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information; b) identification of the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner, such that the financial institution is satisfied that it knows the true and actual identity of the beneficial owner. For legal persons and arrangements this should include financial institutions understanding the ownership and control structure of the customer; (c) understanding and, as appropriate, obtaining information on the purpose and intended nature of the business relationship; and (d) conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds.

23. Banking Defendants are lawfully required to have new business customers provide certain personal identity and corporate documentation commensurate with compliance with FATF when opening an account. The documents required are part of formal customer identification programs that require identification and verification of their customers' identities to combat money laundering and other illegal activities.

24. In accordance with commonly accepted standards in the global banking industry, all of these documents routinely go through a verification process. In accordance with this process, Banking Defendants were expected to inquire as to the nature of the businesses' activities, the purpose of the accounts, and anticipated type and dollar value of financial transactions in which the customer is likely to engage. The Banking Defendants were also to assess and verify the authenticity of the documents and information presented to them to open accounts. None of this was performed by the Banking Defendants in accordance with commonly accepted

standards in the global banking industry for customers reasonably expected to transact business with people or entities from the United States.

25. Upon receipt of these documents, Banking Defendants were required to have the signatory on the accounts physically appear to review and verify the documents and the business accounts signatory's true identity. This too was not done by the Banking Defendants in accordance with commonly accepted standards in the global banking industry for customers reasonably expected to transact business with people or entities from the United States. Instead, upon Recipient Defendants' appearance at a branch of Banking Defendants (assuming it ever happened at all), the business account manager at the local branch either (1) failed to realize there were material discrepancies and irregularities in Recipient Defendants' corporate and identification documents and/or (2) realized there were discrepancies and irregularities in the documents, but acted with deliberate indifference and assisted the fraudulent actor(s) in opening the Accounts. The motive for such conduct is simple—incentives that Banking Defendants have in place for account managers to open business accounts are so compelling that those account managers have little or no monetary incentive to refrain from commencing business relationships with accounts that are handsomely funded and will have substantial wire activity

26. On information and belief based on the corporate documentation now available to Plaintiff, it is reasonably believed that each of the Banking Defendants had in place practices of willful blindness and deliberate indifference to avoid the complexities and responsibilities associated with addressing these issues and to preserve transaction-related revenues from such suspicious accounts that more likely than not had substantial wire and transfer activities from the United States. Banking Defendants appear to have drawn a blind-eye toward illicit proceeds moving from the United States to a plethora of Asian entities whose accounts they custodied and handled, and thus assisted in the extraction of hundreds of thousands of dollars, if not millions, that funded pig-butchering scams.

27. Banking Defendants knew, because they were required to know from their reviews and due diligence, that there were no legal purposes whatsoever associated with setup of the accounts of the Recipient Defendants.

28. The fraudster(s) co-opted the credibility of DBS and other Banking Defendants to imply AML/KYC procedures were being conducted when in fact they were not.

29. Despite actual and/or constructive knowledge that Recipient Defendants' accounts were opened for fraudulent purposes without any legitimate business purposes, Banking Defendants continued to leave the accounts open and enabled victims like Plaintiff to wire funds to them.

30. In approximately June 2023, a fraudster(s) operating under the name Dany Lin first contacted Plaintiff via LinkedIn to present a cryptocurrency investment opportunity to him.

31. Plaintiff was compelled to invest due to Dany Lin's assurances of significant returns in trading cryptocurrency tokens such as USDT.

32. At all relevant times, Richou, FFQI, Xibing, and Weidel were agents and/or alter egos of the fraudster Dany Lin.

33. On October 4, 2023, Plaintiff executed a wire transfer of $300,000.00 via Wells Fargo to an account held by Richou at Chong Hing.

34. On November 22, 2023, Plaintiff executed a wire transfer of $230,000.00 via Wells Fargo to an account held by FFQI at DBS Bank.

35. On December 13, 2023, Plaintiff executed a wire transfer of $245,000.00 via Wells Fargo to an account held by Xibing at Chong Hing.

36. On December 27, 2023, Plaintiff executed a wire transfer of $211,000.00 via Wells Fargo to an account held by Weidel at Fubon.

37. On or about January 2024, Plaintiff discovered the fraud due to the freezing of assets in one of his cryptocurrency accounts for suspected money laundering, in addition to the receipt of requests to provide additional funds to

facilitate termination of the supposed cryptocurrency trading activities. Subsequently, the fraudster(s) requested Plaintiff make payments of short-term capital gains to the Internal Revenue Service before they could release Plaintiff's funds, which appeared to be an additional excuse to request funds from Plaintiff.

38. Plaintiff informed the Recipient Banks of the fraud perpetrated against him in August 2024. The Recipient Banks either disclaimed any responsibility for their actions or did not respond to Plaintiff.

## COUNT I
## FRAUD
### (Against Richou, FFQI, Xibing, and Weidel)

39. At all relevant times, Richou, FFQI, Xibing, and Weidel were entities under custody and/or control of the fraudster named Dany Lin. Dany Lin induced Plaintiff to transfer the proceeds that were intended by Plaintiff to invest in cryptocurrency to accounts at Banking Defendants.

40. The representations that the money would be used for cryptocurrency investments were false when made. They were not involved in investing at all and were improperly diverted by Dany Lin and Richou, FFQI, Xibing, and Weidel after being deposited into fraudulent accounts opened with Banking Defendants.

41. Defendants knew these instructions were false and illegal.

42. Defendants intended that Plaintiff rely on the instructions, which he did in sending the fraudulent wires.

43. Plaintiff has been damaged by Defendants' conduct.

## COUNT II
## AIDING AND ABETTING FRAUD
### (Against Chong Hing Bank, Fubon Bank, and DBS Bank)

44. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

45. To the extent necessary, this cause of action is pled in the alternative.

46. Banking Defendants' accountholder Dany Lin—operating through Recipient Defendants—perpetrated a fraud upon Plaintiff and obtained the stolen

proceeds.

47. Dany Lin intended Plaintiff rely on his representations while purporting to offer cryptocurrency investment opportunities funded through accounts at Banking Defendants.

48. Due to the "red flags" they clearly presented, each of Chong Hing, Fubon, and DBS were aware there was a high probability that Recipient Defendants intended to defraud victims, given that the Recipient Defendants did not provide any substantiation for purported lawful business activities they intended to conduct through the accounts at issue, let alone the conduct of business with people or entities in the United States. And even when substantial activity with people and entities in the United States occurred in these accounts, the Banking Defendants were on inquiry notice of suspicious activities yet did nothing to stop it.

49. Instead, Defendants took deliberate actions to avoid learning or ignoring these facts by omitting to conduct KYC/AML procedures that would have prevented these entities from setting up bank accounts to defraud Plaintiff and likely others. Defendants intended to remain willfully ignorant to be able to abstain from taking affirmative action, because they received revenue from opening new accounts with substantial deposits and wire activity sourced from people and entities in the United States.

50. Defendants rendered substantial assistance to Recipients and perpetrated fraud by (i) deliberately choosing to abstain from KYC/AML procedures prescribed in both the Bank Secrecy Act and international standards as set forth in the FATF that would have easily revealed the fraudulent nature of these companies; (ii) failing to take appropriate action upon learning that Recipients used their bank accounts for illegal or improper purposes; (iii) failure to follow proper protocol in the opening and/or maintenance of the Recipient's accounts; (iv) allowing Recipient Defendants' accounts to remain open despite its lack of proof of any legitimate business.

51. Such conduct amounts to Banking Defendants assenting to the tortious conduct and lending their approval and assistance.

52. Plaintiff has been damaged by Defendants' conduct.

## COUNT III
## NEGLIGENCE
## (Against Chong Hing Bank, Fubon Bank, and DBS Bank)

53. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

54. To the extent necessary, this cause of action is pled in the alternative.

55. The BSA and FATF provisions stated above dictate a standard of care to which Banking Defendants must ascribe. Among other things, this standard of care includes the adherence to the requirements of KYC/AML laws and/or parallel policies, laws, and procedures to prevent fraudulent accounts from being opened in the first place that seek only to perpetuate fraud by coopting the business character and repute of banking institutions.

56. Banking Defendants' deliberate decisions to turn blind eyes to vetting these companies instead of completing due diligence created a special relationship between Banking Defendants and Plaintiff, who faced an increased risk of harm as a result of their deliberate indifference. Plaintiff was part of a foreseeable class of persons who would be and was in fact harmed by fraudsters like Dany Lin seeking to exploit Banking Defendants' failure to conduct any due diligence of substance on new accounts and the bona-fides of those opening them.

57. Defendants breached the common law duties they owed to Plaintiff by failing to exercise reasonable care in their respective account opening procedures and administration in accordance with commonly accepted standards in the global banking industry for customers expected to transact business with persons or entities in the United States.

58. Had Defendants collected even a scintilla of information on the Entity Defendants' operations and institutions owned by or affiliated with the Entity

Defendants, this information would have reasonably allowed for further review and thus detection and reporting of instances of suspicious activity and fraud through those accounts.

59. By facilitating the transfer of money to an account opened without adhering to KYC/AML procedures, and internal policies neither implemented nor enforced under commonly accepted standards in the global banking industry for customers expected to transact business with persons or entities in the United States., Banking Defendants proximately caused Plaintiff to be damaged in an amount no less than $986,000.00.

## COUNT IV
**Violation of California Business & Professions Code § 17200 et seq.**
**(Against All Defendants)**

60. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

61. To the extent necessary, this cause of action is pled in the alternative.

62. Each of the Defendants committed acts of unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising, as defined by Business and Professions Code § 17200 et seq.

63. As set forth in detail above, Recipient Defendants perpetrated a fraudulent cryptocurrency investment scheme against Plaintiff that constitutes common law fraud cognizable under the UCL.

64. Banking Defendants' aiding and abetting and/or negligence in assisting said frauds as set forth above constitutes unlawful conduct under the UCL.

65. The harm to Plaintiff far outweighs the utility of Defendants' ineffective policies and practices for customers expected to transact business with persons or entities in the United States. Defendants and each of their policies and practices are further immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and, therefore, against public policy.

66. Each of Defendants' policies and practices consequently constitute

"unfair" business acts or practices within the meaning of Business and Professions Code §17200 such that significant additional monetary damages should also be awarded in favor of Plaintiff and against all Defendants.

67. Defendants' deceptive policies and practices as set forth above deceived Plaintiff and likely others to invest in purported cryptocurrency trading opportunities when in fact they assisted, aided and abetted malevolent pig-butchering schemes.

68. Plaintiff suffered monetary loss and hereby seeks equitable monetary relief and an order enjoining Defendants from engaging in these deceptive acts and practices set forth herein and imposing an asset freeze or constructive trust over such monies.

69. Furthermore, the illicit business acts or practices of Defendants named herein were (1) fraudulent; (2) malicious and carried out with a willful and conscious disregard for the rights of Plaintiff; and/or (3) entirely oppressive in nature and carried out with the intention of depriving Plaintiff of his substantial rights and significant monies invested. The business acts or practices of Defendants and each of them were all carried out and performed with full knowledge of their wrongful and illicit nature.

## PUNITIVE DAMAGES REQUESTED

70. The collective conduct of the Defendants in this case erodes public confidence of California residents in the soundness and safety of the global banking system. An example should be made of them so that fraudsters and those who harbor them no longer prey on hard-working Californians as "pigs" to be "butchered." In accordance with California Civil Code § 3294, Plaintiff is properly and legally entitled to an additional award of punitive damages in a sufficient amount, to punish and to make an example of the Defendants named herein so as to deter such fraudulent, oppressive, and malicious misconduct in the future in a total amount according to proof at the time of trial, no less than $3 million.

# DEMAND FOR JURY

71. Plaintiff demands a jury trial for determination as to all causes of action as herein alleged.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief against the Defendants as follows:

1. For any and all economic damages according to proof which at this time are believed to be in excess of $986,000.00;

2. For special damages according to proof at trial;

3. For any and all prejudgment interest, post judgment interest according to proof at trial;

4. For attorney's fees and costs that are allowed by law;

5. For punitive damages against Defendants in an amount to be determined according to proof at trial but no less than $3 million; and

6. For such other and further relief as the Court deems just and proper.

Dated: December 31, 2024

Respectfully Submitted,

**LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

*/s/ Keren E. Gesund*
KEREN E. GESUND

*/s/ Robert V. Cornish, Jr.*
ROBERT V. CORNISH, JR.
(*pro hac vice* to be filed)

*Attorneys for Plaintiff Ken Liem*